**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 9 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ARAPAHOE COUNTY PUBLIC AIRPORT
AUTHORITY, a political subdivision of the
State of Colorado,

    Petitioner,

v.

FEDERAL AVIATION ADMINISTRATION,

    Respondent,

CITY OF GREENWOOD VILLAGE,

    Intervenor.

--------------------

REGIONAL AIRLINE ASSOCIATION,

    Amicus Curiae.

No. 99-9508

---

**Appeal from the Federal Aviation Administration**

---

Brian A. Magoon (Ronald S. Loser with him on the briefs) of Brega & Winters,
P.C., Denver, Colorado, for Petitioner.

Christine N. Kohl (David W. Ogden, Acting Assistant Attorney General, and
Michael Jay Singer, Department of Justice, with her on the brief), Department of
Justice, Washington, D.C., for Respondent.

Constance E. Brooks (Michael B. Marinovich and Christine A. Longhitano with

her on the briefs) of C.E. Brooks & Associates, P.C., Denver, Colorado, for Intervenor.

---

Before **BRORBY** and **McWILLIAMS***, Circuit Judges, and **ELLISON**,[*] District Judge.

---

**BRORBY**, Circuit Judge.

---

This case involves the Federal Aviation Administration's (FAA) decision to suspend petitioner's eligibility for discretionary federal grants, based on claimed violations of federal statutes and existing grant provisions. Petitioner Arapahoe County Public Airport Authority (Authority) and Intervenor City of Greenwood Village (City) urge us to set aside the decision for various reasons, not the least of which is the decision is incompatible with an earlier opinion issued by the Colorado Supreme Court. We exercise jurisdiction pursuant to 49 U.S.C. §§ 46110 and 47106(d)(3). For the reasons set forth below, we deny the Petition for Review and affirm the FAA's order.

---

[*] The Honorable James O. Ellison, Senior United States District Judge for the Northern District of Oklahoma, sitting by designation.

-2-

# BACKGROUND[1]

The Authority owns and operates Centennial Airport, which is located just south of Denver, Colorado. Operations at the airport historically have consisted of "unscheduled" commercial passenger and cargo service. In the course of operating the airport, the Authority has accepted millions of dollars in discretionary grants from the FAA. As part of the grant process, the Authority made assurances the airport would be "available ... for public use on reasonable terms and without unjust discrimination, to any person, firm, or corporation to conduct or to engage in any aeronautical activity for furnishing services to the public at the airport." However, within the same grant assurance, the FAA also recognized the Authority "may prohibit or limit any given type, kind or class of aeronautical use ... if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public."

Over the course of several years, Centennial Express Airlines (Centennial Express) divulged an interest in providing scheduled passenger service at Centennial Airport, culminating in an official application in May 1993.

---

[1] The Authority states in its brief the only issues on appeal are legal in nature. Therefore, the facts presented in the background section of this opinion draw extensively from the FAA's decision.

Centennial Express submitted its application despite the Authority's actions one month earlier placing a moratorium on the consideration of applications for scheduled passenger service. The moratorium was designed to provide the Authority time to determine whether it could legally prohibit scheduled service. While the Authority asked for guidance from the FAA on the question, it ultimately decided to completely ban all scheduled air carrier service without waiting to hear from the FAA.[2] In contravention of the Authority's ban, Centennial Express initiated scheduled passenger service between Centennial Airport and Dalhart, Texas on December 20, 1994. The Authority immediately sought and obtained a temporary injunction in state district court to prevent Centennial Express from offering scheduled passenger service.

The state district court eventually granted the Authority a permanent injunction. Centennial Express successfully appealed the injunction to the Colorado Court of Appeals, but a plurality of the Colorado Supreme Court

---

[2] The Authority wrote the FAA in July 1993, and adopted the ban in September 1994. The FAA responded in December 1994. The FAA response was not favorable to the ban, stating: "In addressing similar cases in the past, [the] FAA has found it arbitrary to exclude any particular class of service due to factors that are not reasonably related to the impacts of that service." The FAA also found the Authority submitted insufficient information "to demonstrate that a restriction of any particular category of operation could be adequately supported," and concluded "existing policy on airport access must be complied with."

reversed the state court of appeals and reinstated the permanent injunction. *See*

*Arapahoe County Pub. Airport Auth. v. Centennial Express Airlines, Inc.*, 956

P.2d 587 (Colo. 1998) (en banc). The Colorado Supreme Court issued its opinion

despite concurrent complaints on file with the FAA, and in so doing decided

federal law did not preempt the Authority's ban on scheduled passenger service

and the ban did not violate the terms of the non-discrimination grant assurances.

*See id.* at 592-97. The FAA was not a party to this state litigation.

As alluded to in the previous paragraph, the agency decision-making

process under review here got its start at the same time as the state litigation, and

involves the same basic facts. Thomas Kehmeier, a Centennial Express

stockholder, filed the first complaint with the FAA in August 1994, claiming the

Authority's ban violated federal law and the grant assurances. Centennial

Express filed its own complaint in January 1995. As the Colorado Supreme Court

noted, the FAA had yet to rule on either complaint in 1998 when the court issued

its opinion. *Arapahoe County Pub. Airport Auth.*, 956 P.2d at 592. These initial

complaints were filed pursuant to 14 C.F.R. Part 13. New rules, found at 14

C.F.R. Part 16, and entitled "Rules of Practice for Federally-Assisted Airport

Enforcement Proceedings," went into effect December 16, 1996. Centennial

Express filed a second complaint under the new part 16 rules on February 23,

1998, just two months prior to the Colorado Supreme Court's decision. Centennial Express filed the second complaint even though the company had voluntarily surrendered its FAA operating certificate in January 1996.

After consolidating the three complaints, and despite the then-existing Colorado Supreme Court decision to the contrary, FAA's Director of the Office of Airport Safety and Standards issued an initial determination on August 21, 1998, concluding the ban violated the grant assurances and federal law. The Authority requested a hearing,[3] which was held over two days in November 1998, and resulted in an affirmance of the director's initial decision. The Authority and the City subsequently appealed the hearing officer's decision to the FAA Associate Administrator for Airports, who issued the FAA's Final Agency Decision and Order affirming the previous decisions. The Authority then filed the current petition for review, and the City filed a Notice of Intervention pursuant to 10th Circuit Rule 15.2(A).[4]

---

[3] The hearing officer granted the City's motion to intervene; therefore, City also participated in the hearing.

[4] The FAA argues the City is without statutory authority to intervene in this review. We assume for purposes of this opinion, but do not decide, that the City's intervention is proper. However, as an intervening party, the City may join issue only on matters brought before the court by the Authority as petitioner. *See Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990) (citing *Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944) ("an intervenor is admitted

## STANDARD OF REVIEW

Our review of the FAA's final decision and order suspending the
Authority's eligibility for discretionary federal grants is governed by the
Administrative Procedure Act, 5 U.S.C. § 706.[5]  Within this context, we review
matters of law de novo.  *See Wyoming Farm Bureau Fed'n v. Babbitt*, 199 F.3d
1224, 1231 (10th Cir. 2000).  However, the FAA's findings of fact are conclusive

---

to the proceeding as it stands, and in respect of the pending issues, but is not
permitted to enlarge those issues")).  We acknowledge this limitation is a
prudential determination as opposed to a mandate of rule or statute, *see Synovus
Fin. Corp. v. Board of Governors*, 952 F.2d 426, 433-34 (D.C. Cir. 1991);
nonetheless, we agree it should be avoided only in "extraordinary cases." *New
York v. Reilly*, 969 F.2d 1147, 1154 n.11 (D.C. Cir. 1992).  This is not an
extraordinary case.  The City's issues, as a whole, are directed toward the
complainants' standing, alleged due process deficiencies, mootness and laches.
Although the City summarily characterizes these issues as related to "prudential
jurisdictional deficiencies," after careful examination we conclude the City's
issues are not "essential predicates" or substantively connected to the issues the
Authority presented in its brief and Petition for Review.  *See United States Tel.
Ass'n v. FCC*, 188 F.3d 521, 530-31 (D.C. Cir. 1999). Moreover, the City presents
no reason why it could not have petitioned for review in its own right. *See id.* at
531.  We therefore decline to consider issues raised by the City but not the
Authority.

[5]  A reviewing court may set aside an agency determination pursuant to 5
U.S.C. § 706(2) if it is (a) arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law; (b) contrary to constitutional right, power,
privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or
limitations, or short of statutory right; (d) without observance of procedure
required by law; (e) unsupported by substantial evidence; or (f) unwarranted by
the facts to the extent they are subject to de novo review.  5 U.S.C. § 706(2); *see
Lewis v. Babbitt*, 998 F.2d 880, 881-82 (10th Cir. 1993).

if supported by substantial evidence. *See id*; 49 U.S.C. § 46110(c). The substantial-evidence standard does not allow us to displace the FAA's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Babbitt*, 199 F.3d at 1231 (quotation marks and citation omitted); *see also Trimmer v. United States Dep't of Labor*, 174 F.3d 1098, 1102 (10th Cir.1999) (same).

## ANALYSIS

The Authority contends the final FAA decision and order should be set aside for the following three "errors of law:" (1) the Colorado Supreme Court opinion reinstating the permanent injunction against Centennial Express "is final, preclusive and dispositive;" (2) the Authority and not the FAA determines whether scheduled passenger service will be prohibited as necessary for the safe operation of the airport and to serve the public's civil aviation needs; and (3) any allowable scheduled passenger service must be limited to aircraft designed for nine or fewer passenger seats.[6] We address each alleged error in turn.

---

[6] The City, as Intervenor, joins in this third issue, contending "FAA acted outside or abused its authority when it prosecuted [the Authority] for banning scheduled passenger service after Congress amended the federal aviation laws to prohibit scheduled passenger service of more than 10 seats at uncertified airports and to further provide that no airport can be compelled to secure a certificate."

The Colorado Supreme Court Decision

The Authority argues, pursuant to the Full Faith and Credit Act, 28 U.S.C. § 1738, that *Arapahoe County Public Airport Authority v. Centennial Express Airlines*, 956 P.2d 587, "is final, preclusive and dispositive" of the issues resolved in the FAA's final order. The Full Faith and Credit Act provides that the "judicial proceedings of any court of any such State ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738.

The FAA asserts 28 U.S.C. § 1738 is not technically implicated here because it is an agency rather than a court, *see American Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 799 (5th Cir.), *cert. denied*, 120 S. Ct. 2762 (2000); however, "[b]ecause most agency decisions may be reviewed in federal courts, and those courts must follow section 1738, [the FAA] therefore assume[s] that a common law rule of preclusion, like that embodied in section 1738, governs federal agency proceedings." We agree with the FAA and the Fifth Circuit that the preclusive effect, if any, of the Colorado Supreme Court decision derives from the common law doctrines of res judicata and issue preclusion (collateral estoppel), not § 1738. *See id.* at 799-800 & n.6. We further agree these common

law doctrines extending full faith and credit to state court determinations are trumped by the Supremacy Clause if the effect of the state court judgment or decree is to restrain the exercise of the United States' sovereign power by imposing requirements that are contrary to important and established federal policy. *See id*. at 800; *see also Midgett v. United States*, 603 F.2d 835, 845 (Ct.Cl. 1979). Balancing, de novo,[7] the common law justification for full faith and credit with the competing policy supporting the Supremacy Clause, we conclude the FAA is not required to give preclusive effect to the Colorado Supreme Court's decision in *Arapahoe County Public Airport Authority v. Centennial Express Airlines*.

We begin our analysis on the full faith and credit side of the equation. A close look at the Colorado Supreme Court decision reveals the primary issue before that court was the propriety of a permanent injunction enjoining Centennial Express from conducting scheduled air carrier service in and out of Centennial Airport. As such, the Colorado Supreme Court focused from the outset on

---

[7] *See American Airlines*, 202 F.3d at 799 (declining to defer to agency's ruling on full faith and credit issue); *see also Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 650 (1990) (acknowledging a reviewing court need not afford deference to agency interpretation of statute or law it is not charged with administering); *American Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 297 (5th Cir. 1998) (same).

Centennial Express' conduct in contravention of state regulations. *Arapahoe County Pub. Airport Auth.*, 956 P.2d at 593, 596 (stating that to defer to federal agency jurisdiction would be to "allow future airport users to unilaterally conduct and continue operations in violation of airport rules so long as they implicate federal jurisdiction in some way"). To the extent the Colorado Supreme Court addressed federal preemption issues and the Authority's obligations under the federal grant assurances, it did so in the narrow context of rejecting Centennial Express' defenses. *Id*. at 593-97. Further examination reveals that the court's conclusion the Authority did not violate the terms of the federal grant assurances lacks the depth and breadth of analysis given to those same issues by the Director of the FAA's Office of Airport Safety and Standards, the Hearing Officer, and ultimately, the Final Agency Decision and Order issued by the Associate Administrator for Airports. *Id*. at 596-97.

The credit to be given to the state court opinion is further influenced by the fact the Colorado Supreme Court was seriously divided in this case, as evidenced by its plurality opinion – three of seven justices participated in the majority, one justice concurred, two justices dissented, and one justice abstained. *Id*. at 597. Of particular note here, Justice Scott, while concurring in the result, considered it "inappropriate" to address preemption in light of the fact the FAA had not yet

acted under its authority. *Id*. at 597-98 (Scott, J. concurring). He justified the Colorado Supreme Court's holding based on its inherent authority to "issue an injunction to preserve the status quo pending resolution of the dispute in an appropriate forum." *Id.* at 599. Given Justice Scott's position, and the additional fact the two dissenting justices concluded that "in keeping with the doctrine of primary jurisdiction" the FAA is the appropriate forum to determine issues pertaining to preemption and grant compliance under federal statute, *id.* at 599 (Bender, J. and Martinez, J. dissenting), only half the participating court (three of six) ostensibly precluded the FAA from issuing a contrary ruling.

Last, but certainly not least, the FAA was not a party to, nor in privity with a party to, the state court proceedings. The FAA's interest in fulfilling its statutory responsibility to ensure airport compliance with federal aviation laws and grant assurances, and to protect the public interest, is obviously independent of the interests of any particular air carrier (*e.g.*, Centennial). Mere knowledge of the state court proceedings did not oblige the FAA to participate in those proceedings. *See Martin v. Wilks*, 490 U.S. 755, 762-65 (1989). Without the FAA as a party, the Colorado Supreme Court decision does not satisfy a fundamental requirement of issue preclusion under federal or Colorado law. *See, e.g., Baker v. General Motors Corp.*, 522 U.S. 222, 237 n.11 (1998) ("In no event

... can issue preclusion be invoked against one who did not participate in the prior adjudication."); *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 895 (10th Cir. 1994) ("collateral estoppel fails here simply because [plaintiff] was not a party to the first suit"); *O'Neill v. Simpson*, 958 P.2d 1121, 1123 n.5 (Colo. 1998) (en banc) ("party against whom estoppel is asserted [must have] been a party to or ... in privity with a party in the prior proceeding"). This, together with the other circumstances discussed above, weighs heavily against extending full faith and credit to *Arapahoe County Public Airport Authority v. Centennial Express Airlines*.[8] *See, e.g., Acacia Villa v. United States*, 24 Cl. Ct. 445, 448 (1991)

---

[8] The Authority's reliance on *Town of Deerfield v. FCC*, 992 F.2d 420 (2d Cir. 1993), is misplaced. In *Deerfield*, the FCC was not a party in the state or federal court proceedings initiated by Mr. Joseph Carino to challenge municipal zoning regulations prohibiting the installation of a satellite dish in his backyard. Because the FCC did not want to become "a national zoning board," it required complainants like Mr. Carino to pursue other legal remedies before filing administrative complaints. *Id*. at 423. Only after the federal district court gave preclusive effect to the state court ruling in favor of the town, did the FCC "review" the federal district court's decision and issue an order, which, contrary to the federal district court, ruled that FCC regulations preempted the town's zoning regulation. *Id.* at 426. The Second Circuit Court of Appeals held the FCC impermissibly rendered the federal Article III court's decision a mere advisory opinion. *Id*. at 428-30.

The complexion of this case obviously is very different from *Deerfield*. In *Deerfield*, the FCC acted as a disinterested adjudicator to resolve a zoning dispute between two outside parties; the FCC never disputed state or federal jurisdiction over Mr. Carino's lawsuits. In this case, the FAA became an interested party in the administrative proceedings to determine the Authority's compliance with the grant assurances, and never deferred its right to determine compliance issues in the first instance. Moreover, although the FAA issued its

-13-

(acknowledging the doctrine of issue preclusion is "based on a court's exercise of its equitable powers," and "is not mandated in the Constitution or by statute"); *United States v. Kaytso*, 868 F.2d 1020, 1022 (9th Cir. 1989) (stating "[e]ven when the elements of collateral estoppel are present, the decision whether to apply the doctrine is within the [court's] discretion"); *Western Group Nurseries, Inc. v. Pomeranz*, 867 P.2d 12, 15 (Colo. Ct. App. 1993) (ruling collateral estoppel is an equitable doctrine applied at the court's discretion).

Turning to supremacy principles, we reiterate that the issue before the FAA was whether the Authority complied with the conditions imposed on it by federal law and agreement with a federal administrative agency, in return for the Authority's receipt of federal funds. This federal scheme regulating airport grant compliance is "designed in part to insure the maintenance of conditions essential to an efficient national air transport system, including access to airports on a reasonable and nondiscriminatory basis." *City & County of San Francisco v. FAA*, 942 F.2d 1391, 1395 (9th Cir. 1991), *cert. denied*, 503 U.S. 983 (1992). On this point, we must agree with the Fifth Circuit that in the arena of aviation

---

decision after the Colorado Supreme Court ruled on the propriety of the permanent injunction against Centennial Express, the agency's decision in no way purported to "review, alter, or prevent enforcement of the judgment of an Article III court." *Id*. at 430.

-14-

regulation "federal concerns are preeminent," and the Department of Transportation, through the FAA, is statutorily mandated to represent those concerns. *American Airlines, Inc.*, 202 F.3d at 800-01. Indeed, it is "difficult to visualize a more comprehensive scheme of combined regulation, subsidization, and operational participation than that which Congress has provided in the field of aviation." *New England Legal Found. v. Massachusetts Port Auth.*, 883 F.2d 157, 172-73 (1st Cir. 1989) (discussing the FAA's primary role in administering and ensuring compliance with grant assurances) (quotation marks and citation omitted). This certainly tilts the balance toward the application of supremacy principles to protect against state courts trumping the federal interests and concerns embodied within the airport grant program.

As to the potential impact of the Colorado Supreme Court's ruling in *Arapahoe County Public Airport Authority v. Centennial Express Airlines* on federal regulation of the airport grant program, we perceive a direct and significant conflict inasmuch as this and similar state court rulings, if deemed preclusive, would frustrate the FAA's ability to discharge its statutory duty to interpret and implement federal aviation statutes governing the enforcement of grant assurances. *See* 49 U.S.C. § 47122. If given preclusive effect, state court rulings favoring local airport authorities in actions tangentially involving federal

grant assurances would further lead to inconsistent enforcement of the federally mandated assurances, potentially jeopardizing the efficiency and equality of access to our Nation's air transportation system. For these reasons, we hold the strong policy of federal supremacy in the field of aviation prevails over full faith and credit principles in this case. The Colorado Supreme Court's decision in *Arapahoe County Public Airport Authority v. Centennial Express Airlines* therefore has no bearing on the FAA decision before us.

Determinations based on Safety and Other Civil Aviation Needs

The Authority argues that as the proprietor of Centennial Airport responsible for local and regional aviation planning, it, and not the FAA, determines whether scheduled passenger service will be prohibited at the Airport as necessary for the safe operation of the airport and to serve the civil aviation needs of the public. In support of this argument, the Authority relies largely on the Colorado Supreme Court's conclusion the ban on scheduled passenger service was, indeed, necessary for the safe operation of Centennial Airport and to serve the public's civil aviation needs. As discussed above, that state court conclusion has no bearing on our decision.

Aside from its reliance on the state court decision, the Authority attempts to

retry its case here by convincing us it has good reasons for imposing the ban (including, but not necessarily limited to, the design of and lack of facilities at Centennial Airport; local and regional planning objectives; and the recommendations incorporated in the National Transportation Safety Board's Commuter Airline Safety Study). Our job, however, is not that of fact-finder. We are called on here to review the decision of a federal administrative agency, and we will adhere to the appropriate standards governing such review, as previously articulated in this opinion. *See* 49 U.S.C. § 46110(c); *Wyoming Farm Bureau Fed'n*, 199 F.3d at 1231.

We begin by addressing what we consider the threshold legal issue – whether the Authority is preempted by federal statute from imposing such a ban. The Airline Deregulation Act of 1978 expressly provides that a political subdivision of a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). The Supreme Court has interpreted this provision broadly to preempt all "State enforcement actions having a connection with or reference to airline 'rates, routes, or services.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (interpreting 49 U.S.C. § 1305(a)(1), the substantively identical, pre-1994 version of the Airline Deregulation Act

preemption provision); *see also American Airlines, Inc. v. Wolens*, 513 U.S. 219, 223 & n.1 (1995). The preemption provision does not, however, prevent a state or political subdivision of a state from carrying out its "proprietary powers," 49 U.S.C. § 41713(b)(3), so long as the exercise of proprietary powers is reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed not to conflict with the Airline Deregulation Act and its policies. *See* 14 C.F.R. § 399.110(f). The validity of the Authority's ban therefore depends on (1) whether the Authority's ban "is related to a price, route, or service of an air carrier" implicated by 49 U.S.C. § 41713(b)(1); (2) if so, whether the Authority's ban amounts to an exercise of its propriety powers; and (3) if it is an exercise of proprietary powers, whether such exercise is reasonable, nondiscriminatory, nonburdensome and not in conflict with the Airline Deregulation Act, and thus exempted from preemption by 49 U.S.C. § 41713(b)(3).

We easily conclude the Authority's ban is connected with and relates to both services and routes. *See Morales*, 504 U.S. at 384. By banning scheduled passenger service, the Authority has affirmatively curtailed an air carrier's business decision to offer a particular service in a particular market. The ban also significantly impacts the scope of services available to public citizens desiring to travel by air from Centennial Airport. We reject any contention that "service" as

-18-

used in 49 U.S.C. § 41713(b)(1) is not intended to include transportation itself, considering the Airline Deregulation Act's objective to enhance "the availability of a variety of adequate, economic, efficient, and low-priced services," 49 U.S.C. § 40101(4), and to "encourag[e] entry into air transportation markets by new and existing air carriers and the continued strengthening of small air carriers to ensure a more effective and competitive airline industry." 49 U.S.C. § 40101(13); *see also Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc) ("Elements of the air carrier service ... include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself.").

The effect of such a ban further extends to route determinations because the carrier cannot conduct regular operations over any route involving the banned airport. We agree with the FAA that a prohibition on operating over any route is no less a regulation of routes than a restriction on the number of routes a carrier can operate from an airport.

Having determined the Authority's ban on scheduled passenger service constitutes a state regulation of air carrier service and routes, the ban is permissible only if it constitutes an exercise of the Authority's propriety power.

Although the Authority largely evades a direct discussion of the preemption issue in its briefs to this court, it suggests the scheduled passenger service ban is *per se* an exercise of its propriety power, because Grant Assurance 22i (patterned after Standard Assurance 22i, *see* 62 Fed. Reg. 29761, 29766 (1997)) permits the Authority to "prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public." Thus, because the Authority determined "the ban was necessary for the safe operation of Centennial [Airport] and to serve the civil aviation needs of the public," it argues the proprietary powers exception to the statutory preemption provision applies.

"The precise scope of an airport owner's proprietary powers has not been clearly articulated by any court." *American Airlines, Inc.*, 202 F.3d at 806. Courts have, however, "recognized that local proprietors play an extremely limited role in the regulation of aviation." *Id*. (quotation marks and citation omitted). This acknowledgment alone undermines the Authority's apparent assertion that so long as they declare their regulatory action necessary for safety or to satisfy aviation needs, they enjoy carte blanche power. For purposes of this review, however, we will assume, without deciding, that regulatory conduct related to safety and civil aviation needs may fall under the "proprietary powers"

umbrella, because under any circumstances, grant assurance language notwithstanding, "[i]n defining the permissible scope of a proprietor's power to regulate under §14713(b)(3) ... an airport proprietor can issue only 'reasonable, nonarbitrary, and nondiscriminatory rules that advance the local interest.'" *Id.* (quoting *Western Air Lines v. Port Auth. of New York & New Jersey*, 658 F.Supp. 952, 958 (S.D.N.Y. 1986)).   We therefore proceed to the third and final preemption inquiry.

At this point, we focus on whether the Authority's proclaimed "safety" and "civil aviation needs" justification is reasonable or nonarbitrary.  We agree with the FAA this determination is a factual one for which the Authority, as the party asserting the justification, bears the burden of proving before the agency.  *See* 14 C.F.R. § 16.229(c). Because of the fact-based nature of this inquiry, we must defer to the FAA's findings (1) the Authority failed to demonstrate the ban is necessary for the safe operation of the airport, and (2) the Authority failed to demonstrate the ban is necessary to satisfy the public's civil aviation needs, so long as those findings are supported by substantial evidence in the record.[9]  49

---

[9] Although the Authority did not directly challenge the reasonableness of the FAA's findings on economic discrimination and exclusive rights, having carefully reviewed the administrative record, we conclude those findings are supported by substantial evidence, and therefore deem them conclusive.

-21-

U.S.C. §46110(c); *Wyoming Farm Bureau Fed'n*, 199 F.3d at 1231. We conclude they are.

Our careful review of the administrative record confirms a dearth of evidence to support the Authority's claim that the ban on scheduled service is necessary due to ground congestion, operational safety and environmental impact concerns. As noted by the FAA hearing officer, the testimony of individuals representing both the Authority and the City was largely speculative. The Authority and City submitted no quantitative analysis of the probable impacts of scheduled passenger airline service at Centennial airport. Conversely, the testimony of Mr. Barry Molar, Manager of FAA's Office of Airport Compliance, and other FAA representatives effectively rebutted the Authority's and City's evidence,[10] demonstrating that the Authority's concerns pertain to impacts that are

---

[10] For example, the Authority relies heavily on a general National Transportation Safety Board (NTSB) recommendation, derived from a Commuter Airline Safety Study (and Quincy Aircraft Accident Report), that scheduled passenger service be permitted only at airports certified pursuant to 14 C.F.R. Part 139. According to the Authority, it is not certified under Part 139 and has no intent to become certified. Moreover, the Authority claims it must rely on off-the-airport and non-exclusive fire protection services, which cannot respond to an airport emergency within three minutes. The Authority further claims it does not have the financial resources to provide exclusive, on-the-airport fire and rescue services.

In rebuttal, the FAA put into evidence proof the NTSB recommendation is a nonbinding recommendation which neither the Authority nor the FAA must

"largely a function of the total number of operations at the airport," and are not particularized to scheduled passenger service. In other words, the record substantiates the FAA's ruling that "[i]nasmuch as the Authority permits unscheduled passenger services using similar airplanes, flight patterns, making the same amount or more of noise, and does not limit the number of operations at the airport," the Authority fails to demonstrate how the ban on scheduled passenger service will alleviate the safety concerns and civil aviation needs the Authority and the City raise.

Because the record supports the FAA's findings that the Authority unreasonably exercised its proprietary powers to ban scheduled passenger service at Centennial Airport, we hold the Authority has exceeded its legitimate scope of power as a state or local government under 49 U.S.C. § 41731(b) and the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI, cl. 2. The Authority's ban therefore is preempted by federal law.

---

follow, and Centennial Airport is not subject to a three-minute fire response time requirement. The FAA also elicited testimony the fire safety concern is no different for scheduled passenger service than it is for unscheduled, charter passenger service. Finally, the FAA demonstrated the Authority imposed the ban on scheduled passenger service prior to publication of the NTSB report.

Limitations on Scheduled Passenger Service

The Authority and the City assert that even if the ban on scheduled passenger service is unlawful, we should require the FAA to rule that passenger operations at Centennial Airport must be limited to nine-passenger aircraft in light of 1996 legislative amendments requiring airports to have a Part 139 certificate for scheduled passenger operations involving aircraft of more than nine passenger seats. *See* 49 U.S.C. § 44706(a)(2). Centennial Airport does not have such a certificate. Furthermore, the statute provides that the FAA cannot force the Authority to obtain a certificate. *See id.* at § 44706(f).

The FAA concluded it was unnecessary to resolve this issue because (1) the amended statute had not taken effect; and (2) the ban on scheduled passenger service at issue is total, providing no exception for aircraft with nine or fewer passenger seats, as evidenced by the fact the Authority sought and obtained an injunction against Centennial Express's *six*-passenger aircraft. We likewise decline to resolve this issue as it is not presented by the facts in this case. The Authority does not dispute that its ban on passenger service, as considered by the FAA, is indeed a total ban; nor does the Authority claim it has a pending request to provide service which would justify further consideration of the amended statute.

-24-

**CONCLUSION**

Because we hold (1) the Colorado Supreme Court's decision in *Arapahoe County Public Airport Authority v. Centennial Express Airlines* is not final, preclusive or dispositive of the issues resolved in the FAA's final order; (2) the Authority's ban on scheduled passenger service is preempted by statute and the Supremacy Clause; and (3) the present facts do not warrant prospective consideration of how 49 U.S.C. § 44706, as amended in 1996, might apply, we **DENY** the Authority's Petition for Review and **AFFIRM** the FAA's final Order.