**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 20, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

NEIL KUNZ,

    Petitioner,

v.

FEDERAL AVIATION
ADMINISTRATION,

    Respondent.

------------------------------------

SALT LAKE CITY CORPORATION,

    Intervenor-Respondent.

No. 22-9583
(FAA No. 16-21-06)
(Federal Aviation Administration)

_____

**ORDER AND JUDGMENT***
_____

Before **TYMKOVICH**, **McHUGH**, and **CARSON**, Circuit Judges.
_____

Over the course of thirteen years, Petitioner Neil Kunz sought, unsuccessfully,

compensation from Salt Lake City, Utah (the City)[1] for a fee purchase of, or

---

* This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and
Tenth Circuit Rule 32.1.

[1] The City intervened in this matter as of right, but ultimately elected not to
file a brief.

easement upon, his residential property adjacent to the Tooele Valley Airport (the Airport). Notwithstanding that he initiated an inverse condemnation action against the City for a compensable "taking" of his property, which is being actively litigated in Utah state court, Mr. Kunz initiated these regulatory proceedings in 2021. In a so-called "Part 16" administrative complaint, Mr. Kunz asked the Federal Aviation Administration (FAA), the Respondent in this matter, to conclude that by failing to acquire an interest in his property and declining to reimburse him for certain expenses incurred in an earlier condemnation action, the City violated assurances it made as a condition to obtain federal grants for Airport improvements. For a remedy, Mr. Kunz urged the FAA to require the City to repay the grants and withhold approval of any future grants.

The FAA concluded that the City did not violate its assurances, and Mr. Kunz then timely petitioned for review. Exercising jurisdiction under 49 U.S.C. § 46110, we affirm because Mr. Kunz has not established any error in the FAA's resolution of his administrative complaint.

## I.    BACKGROUND

### A.    *The Airport, its receipt of federal grants, and continuing assurances to which it is subject*

The City acquired the Airport, a public-use general airport located in Tooele County, in 1991. Because the Airport is not within Salt Lake City boundaries, the City cannot directly control the zoning or other land use ordinances that burden the adjacent lands. The City's subsequent development of the Airport was financed, in

part, with about $10 million in federal grants under the Airport Improvement Program (AIP), which is authorized by the Airport and Airway Improvement Act of 1982. *See* 49 U.S.C. § 47101 *et seq.* Under that Act, the Secretary of Transportation may approve an AIP grant application only if "the Secretary receives written assurances, satisfactory to the Secretary," that the recipient airport sponsor[2] will comply with an array of laws and conditions ranging from general aviation safety requirements to nondiscrimination provisions. 49 U.S.C. § 47107. Section 47107(g) requires the Secretary to "prescribe requirements for sponsors that the Secretary considers necessary" to "ensure compliance" with those statutory requirements.

The FAA Administrator, acting pursuant to a delegation from the Secretary of Transportation, 49 C.F.R. § 1.83(a)(9), has implemented these requirements into a standardized set of thirty-nine assurances that "shall be complied with in the performance of grant agreements for airport development . . . grants for airport sponsors." AR at 320. Those assurances are continuing in nature; that is, they "remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development" project. *Id.*

The following assurances are implicated by this appeal:

***Assurance 20 (Hazard Removal and Mitigation):***

[The sponsor] will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting

---

[2] "Airport sponsor" means "a public agency with control of a public-use airport," here, the City. AR at 320.

or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

*Id.* at 328.

### Assurance 21 (Compatible Land Use):

[The sponsor] will take appropriate action, to the extent reasonable, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft.

*Id.*

### Assurance 29 (Airport Layout Plan):

. . . [the sponsor] will keep up to date at all times an airport layout plan of the airport showing:

1) boundaries of the airport and all proposed additions thereto, together with the boundaries of all offsite areas owned or controlled by the sponsor for airport purposes and proposed additions thereto;

2) the location and nature of all existing and proposed airport facilities and structures . . . including all proposed extensions and reductions of existing airport facilities;

3) the location of all existing and proposed non-aviation areas and of all existing improvements thereon; and

4) All proposed and existing access points used to taxi aircraft across the airport's property boundary.

Such airport layout plans and each amendment, revision, or modification thereof, shall be subject to the approval of the Secretary which approval shall be evidenced by the signature of a duly authorized representative of the Secretary on the face of the airport layout plan. The sponsor will not make or permit any changes or alterations in the airport or any of its facilities which are not in conformity with the airport layout plan as approved by the Secretary and which might, in the opinion of the Secretary, adversely affect the safety, utility or efficiency of the airport.

[] Subject to the FAA Reauthorization Act of 2018, Public Law 115-254, Section 163, if a change or alteration in the airport or the facilities is made which the Secretary determines adversely affects the safety, utility, or efficiency of any federally owned, leased, or funded property on or off the airport and which is not in conformity with the airport layout plan as approved by the Secretary, the owner or operator will, if requested, by the Secretary (1) eliminate such adverse effect in a manner approved by the Secretary; or (2) bear all costs of relocating such property (or replacement thereof) to a site acceptable to the Secretary and all costs of restoring such property (or replacement thereof) to the level of safety, utility, efficiency, and cost of operation existing before the unapproved change in the airport or its facilities except in the case of a relocation or replacement of an existing airport facility due to a change in the Secretary's design standards beyond the control of the airport sponsor.

*Id.* at 332–33.

### Assurance 35 (Relocation and Real Property Acquisition):

[The sponsor] will be guided in acquiring real property, to the greatest extent practicable under State law, by the land acquisition policies in Subpart B of 49 CFR Part 24 and will pay or reimburse property owners for necessary expenses as specified in Subpart B.

*Id.* at 336.

The regulations referenced in Assurance 35 implement the Uniform Relocation Assistance and Real Property Acquisition Act (the Relocation Act), 42 U.S.C. § 4601 *et seq*. As relevant here, subchapter III of that Act—titled "Uniform Real Property Acquisition Policy"—requires, among other things, that agencies "shall, to the greatest extent practicable, be guided by" ten enumerated "policies" when acquiring real property. 42 U.S.C. § 4651.[3]

---

[3] Section § 4651 "omits any language conferring rights or benefits on landowners," and § 4602(a) makes clear that the land-acquisition "policies" in § 4651 "create no rights or liabilities." *Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438, 443 (4th Cir. 2014). As such, courts generally hold that a landowner has no private right of action to enforce an agency's compliance with the acquisition

5

The regulations implementing subchapter III of the Relocation Act define "agency" broadly as "any entity utilizing Federal funds or Federal financial assistance for a project or program that acquires real property." 49 C.F.R. § 24.2(a). And the regulations relevant to this petition—contained in Subpart B, titled "Real Property Acquisition"—"apply to any acquisition of real property for programs and projects where there is Federal financial assistance in any part of project costs." 49 C.F.R. § 24.101(b). These regulations, when applicable, require (1) that the agency comply with enumerated land-acquisition policies mirroring those in § 4651 of Relocation Act, 49 C.F.R. § 24.102, and (2) that real property owners be reimbursed for litigation expenses, including attorney fees, incurred "because of a condemnation proceeding" if "[t]he condemnation proceeding is abandoned by the agency other than under an agreed-upon settlement." 49 C.F.R. § 24.107(b).

---

"policies" in § 4651. *See id.* ("[I]n imposing policies on the heads of federal and state agencies in §§ 4651 and 4655, [the Relocation Act] creates no individually enforceable rights."); *see also Osher v. City of St. Louis*, 903 F.3d 698, 702 (8th Cir. 2018) ("[W]e conclude that Congress did not create a private cause of action to enforce the [Relocation] Act."); *Serna v. City of Colorado Springs*, No. 24-1149, 2025 WL 471224, at *2 (10th Cir. Feb. 12, 2025) ("agree[ing]," in a nonbinding unpublished decision, "with other federal courts that 'the [Relocation Act], in imposing policies on the heads of federal . . . agencies . . . , creates no individually enforceable rights'" (quoting *Clear Sky Car Wash*, 743 F.3d at 444)). Indeed, but for the Administrative Procedure Act and the FAA's provision of an administrative complaint procedure—discussed below in § I.D—Mr. Kunz could not vindicate alleged noncompliance by the City with the "policies" in § 4651.

**B.**     *The Kunz property, the FAA's installation of an Instrument Landing System, and the FAA's approval of an updated Airport Layout Plan*

In 1999, Dick D. Kunz purchased twenty-one acres of vacant land immediately adjacent to the extant Airport, which he later subdivided into four parcels. In 2001, a residence was constructed on one of those parcels, Lot 1. Between 2005 and 2007, in anticipation of the FAA's installation of an Instrument Landing System (ILS)[4] at the Airport, the City made offers to purchase an avigation easement[5] that would have included Lot 1. These offers were "declined due to disagreement over the fair market value of the easement."[6] AR at 558.

In June 2007, Dick D. Kunz deeded Lot 1 to Petitioner, Mr. Neil Kunz. In July 2007, pursuant to an authorization from the Salt Lake City Council, the City filed a condemnation action in Utah state court for an avigation easement over a swath of land that included Mr. Kunz's parcel. In 2008, the FAA installed an ILS at the

---

[4] An ILS "provides both vertical and lateral guidance information for pilots to allow safe landings to touchdown. The ILS sends information to instruments in the cockpit so that the pilot can maintain a predetermined flight path to the runway in low visibility." Fed. Aviation Admin., *GBN—Instrument Landing System* (Dec. 4, 2023), https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/techops/navservices/gbng/ils [https://perma.cc/KB8Z-FYBS].

[5] Black's law dictionary defines "avigation[] easement" as "[a]n easement permitting unimpeded aircraft flights over the servient estate." *Easement*, Black's Law Dictionary (12th ed. 2024).

[6] The City's final offer was (1) $281,000 for an avigation easement over roughly half of the full tract, or (2) $1,835,000 for a fee simple purchase of the entire tract.

Airport, notwithstanding the absence of any easement on the land that was the subject of the then-pending condemnation action.

In June 2010, the FAA approved an updated Airport Layout Plan (ALP) submitted by the City, which reflected the installation of the ILS and which further identified all adjacent parcels of land. The ALP contained a table identifying each adjacent parcel's owner, the City's property interest in those parcels (if any), and the purpose of the City's acquisition of any such property interests. The table further included a column titled "Agreement," which contained the numbers used to identify federal grant agreements that provided the City with funds to acquire property interests in certain adjacent parcels. The Kunz parcel—identified as "Tract 11" and inclusive of all four subdivided plots therein—was listed alongside a double asterisk, which denoted properties that "have not been purchased by the airport." *Id.* at 318. In the column identifying the interest held by the City in each property, the Kunz tract indicated that it was subject to a "possible avigation easement." *Id.*

### C. *Utah state court litigation*

In 2018, roughly eleven years after the City filed a condemnation action against Mr. Kunz, the state district court granted Mr. Kunz's[7] motion for summary judgment on grounds that the City had not followed Utah's statutory process requirements before initiating a condemnation action. Mr. Kunz raised this

---

[7] Several other persons who possess property interests in the other three subdivided plots were also party to this state condemnation action. We refer only to Mr. Kunz because he instituted the FAA regulatory proceedings and brought this petition for review on his behalf only.

procedural defect "on the eve of trial" following the district court's entry of an order excluding Mr. Kunz's "only designated appraisal expert" and the City's consequent motion for judgment as a matter of law. *Id.* at 86. The City resisted dismissal and sought to amend its complaint to cure the procedural defects to no avail. While the state court held the action could not proceed because the City had not strictly complied with statutory notice requirements, it also held that the City had established, for purposes of state eminent domain law, the necessity of acquiring Mr. Kunz's property, concluding it was "undisputed that [an] avigation easement . . . was a condition for federal funding." *Id.* at 69.

The state court further denied Mr. Kunz's request for attorney fees and costs, after which the City and Mr. Kunz took cross appeals. In October 2020, the Utah Court of Appeals affirmed the state district court in full, concluding summary judgment was proper because the City did not strictly comply with statutory process requirements, and further that Mr. Kunz was not entitled to attorney fees and costs.

In March 2019, the City Council approved the pursuit of another condemnation action for an avigation easement. Informal negotiations for an easement or fee purchase of the property were unsuccessful because Mr. Kunz believed the City's offers improperly reflected appraisals rendered twelve years prior, in 2007. To date, the City has not initiated a second condemnation proceeding pursuant to this 2019 authorization.

However, in March 2020, while the cross-appeals in the condemnation action were pending, Mr. Kunz initiated a new action in Utah state court against the City,

9

asserting claims for inverse condemnation, trespass, nuisance, and a claim asserting breach of the federal grant agreements. The City sought dismissal of the trespass, nuisance, and contract claims but *not* the inverse condemnation claim. The Utah state court granted the City's motion to dismiss three of the four claims. The parties agree that there remains a live inverse condemnation claim against the City in Utah state court regarding Mr. Kunz's property. The FAA was not party to any Utah state court proceeding.

### D.    *Part 16 proceedings*

In March 2021, Mr. Kunz turned to the FAA for resolution of his property dispute, filing a so-called "Part 16" formal complaint. Part 16 proceedings enable any "person directly and substantially affected by any alleged noncompliance" with an FAA grant assurance to "file a complaint." 14 C.F.R. § 16.23(a). A Part 16 complaint must contain "the specific provisions" of a grant agreement[8] "that the complainant believes were violated." 14 C.F.R. § 16.23(b)(1).

The scope of issues appropriately raised in Part 16 proceedings extends only to alleged noncompliance with specifically enumerated federal statutes and grant agreements. *See* AR at 565 ("[T]he FAA's jurisdiction is specifically limited to proceedings involving complaints against federally assisted airports arising under

---

[8] Section 16.23 requires identification of "specific provisions of each Act" the complainant believes to be violated, but the regulations define "Act" "as a statute listed in § 16.1 and any regulation, agreement, or document of conveyance issued or made under that statute." 14 C.F.R. § 16.3. Section 16.1, in turn, includes "[t]he assurances and other Federal obligations contained in grant-in-aid agreements issued under the Airport and Airway Improvement Act of 1982." 14 C.F.R. § 16.1(a)(5).

legal authority outlined in the Part 16 regulations . . . ."). To enforce these regulatory jurisdictional limits, the Part 16 regulations provide that a respondent may move to dismiss a complaint that "appears on its face to be outside the jurisdiction of the Administrator under the Acts listed in § 16.1." 14 C.F.R. § 16.26(b)(1)(i).

Part 16 regulations assign adjudicative authority in the first instance to the Director of the FAA Office of Airport Compliance or his designee (hereinafter, the "Director"). *See* 14 C.F.R. § 16.3; 16.31(a). Any party "adversely affected by the Director's Determination may appeal the initial determination" to the Associate Administrator for Airports or his designee (hereinafter, the "Administrator"). 14 C.F.R. § 16.31(c); *see* 14 C.F.R. § 16.3; 16.33.

Mr. Kunz's Part 16 complaint asserted two violations of Grant Assurance 35/the Relocation Act. First, he alleged that the City's failure to provide "just compensation or [to obtain] any right to occupy [his] property" meant that the City had violated the Relocation Act. AR at 7. Second, he alleged that the City's failure to "initiate new condemnation proceedings" following the City Council's authorization of the same meant that the City had "abandoned" condemnation and was therefore required to pay his litigation expenses incurred in the previous condemnation proceeding. *Id.*; *see* 49 C.F.R. § 24.107(b) (requiring reimbursement of litigation expenses incurred "because of" a condemnation proceeding when the agency "abandon[s]" such proceeding).

Thereafter, the City filed a combined motion to dismiss and motion for summary judgment. The City sought summary judgment on Mr. Kunz's claim for

11

breach of Grant Assurance 35 for failure to pay litigation expenses, arguing that the City cannot be said to have "abandoned" a condemnation proceeding dismissed at Mr. Kunz's request and over the City's objection. And the City asserted that it "has no independent obligation to condemn an avigation easement" over Mr. Kunz's land in the first place. *Id.* at 132. Finally, the City sought dismissal of any other claims arguably encompassed by Mr. Kunz's Part 16 complaint on grounds that they "fall outside the scope of the FAA's jurisdiction under Part 16 [or] fail to state a claim for relief on their face." AR at 133.

Mr. Kunz opposed the City's motion, asserting two overarching arguments. With respect to the litigation-expenses claim, Mr. Kunz argued that the City's failure to initiate new condemnation proceedings "in over two years" since the City Council approved such an action was sufficient to prove the City's "abandonment" thereof. *Id.* at 179–80. And Mr. Kunz again argued the City was required to obtain an avigation easement over his land, though he pointed to no federal legal authority for this proposition. Instead, Mr. Kunz urged that the City was obliged to acquire an interest in his property because of positions taken by the City, and judicial findings made, in the original Utah state court condemnation proceeding. Specifically, Mr. Kunz asserted that the City's obligation to condemn an avigation easement was created by its state court pleadings that represented as statements of material fact that "[t]he City has determined that acquiring the Avigation Easement over the Subject Property is necessary," and "[t]he City needs to acquire the Avigation Easement." *Id.* at 181 (emphases omitted). Mr. Kunz made plain that the City's supposed obligation

12

to condemn an easement arises from these statements: "Per the [City's] statement of material facts to the Third District Court (state court) they are required to acquire the Avigation Easement for the operation of the Airport Project." *Id.* (emphasis omitted).

In March 2022, the Director issued his initial determination, concluding that "the City is not currently in violation of the [Relocation Act] related provisions of Grant Assurance 35." *Id.* at 349. The Director framed two issues for resolution: (1) "Whether the [City] is in violation of Grant Assurance 35 . . . by failing to purchase [Mr. Kunz's] property or an avigation easement over the property," *id.* at 353, and (2) "[w]hether the [City] is in violation of Grant Assurance 35 . . . by failing to pay litigation expenses related to its failed condemnation action," *id.* at 355.

With respect to the first issue, the Director found "that Grant Assurance 35 does not apply in this case" because (1) "Mr. Kunz's property lies outside of the RPZ [Runway Protection Zone]," and (2) "[t]he FAA has not issued an AIP grant for the acquisition of this property." *Id.* at 354. The Director further reasoned that the City's statements "during court proceedings that the avigation easement was required for the ILS installation" were of no moment because "the ILS was subsequently installed in 2008 without an avi[g]ation easement," illustrating that the City's "failure to purchase the property or an easement did not prevent ILS installation." *Id.* Because the FAA had imposed no obligation on the City to acquire an interest in Mr. Kunz's land, the Director found that "the City is currently in compliance with its Grant Assurance 35 obligations." *Id.*

13

With respect to the second issue—whether the City was noncompliant with Grant Assurance 35 by failing to pay Mr. Kunz's litigation expenses from the failed condemnation proceeding—the Director observed that "Mr. Kunz seems to allege that until the City is successful in its case to acquire an easement or purchase the [land], the City must continue to negotiate and thus pay or reimburse property owners for necessary expenses." *Id.* at 356. The Director flatly rejected this argument, explaining that "[t]here is no support for the idea that any FAA grant assurance requires the City to continue to litigate the purchase of property until they are successful." *Id.* Rather, the Director explained, "Grant Assurance 35 and the [Relocation Act] apply only to situations in which the property is acquired with Federal funds." *Id.* (citing FAA regulatory precedent). Because Grant Assurance 35 was not implicated, the Director explained:

> It is outside [the] FAA's jurisdiction [to] address the legal fees for the failed condemnation action in this case. The Part 16 process is not intended to address state law legal claims. The grant assurances do not compel the City to acquire property interests from the Complainant nor specify the terms of such acquisition if so pursued.

*Id.*

Mr. Kunz timely appealed the Director's determination to the Administrator. In addition to reiterating and expanding upon his arguments to the Director—chiefly that Grant Assurance 35 applies because of statements and findings made by the City and Utah state courts, respectively—Mr. Kunz also raised possible violations of Grant Assurances 20 and 21 (governing Hazard Removal and Mitigation and Compatible Land Use, respectively). In support, Mr. Kunz appended the FAA's

14

preliminary findings in two "obstacle identification studies"—undertaken at Mr. Kunz's request—relating to a proposed seventy-five-foot flagpole and an existing tree on certain of the four subdivided Kunz lots. *Id.* at 373. Mr. Kunz seemed to assert that the FAA's preliminary conclusions in those reports that the proposed flagpole and extant tree posed a hazard to air navigation necessarily meant the City was required to condemn an easement over those properties to comply with Grant Assurances 20 and 21. Because the obstacle identification studies were not presented to the Director, Mr. Kunz submitted a Petition for Consideration of New Evidence within his appeal to the Administrator.

The City both defended the Director's determination and opposed Mr. Kunz's attempt to raise violations of Grant Assurances 20 and 21 on grounds that those new theories were "supported only" by the obstacle identification studies improperly presented for the first time on appeal. *Id.* at 447. The City further urged that Mr. Kunz was without standing to raise violations of Grant Assurances 20 and 21 because the obstacle identification studies implicated other of the subdivided Kunz parcels, not Mr. Kunz's land. Finally, the City argued that it was compliant with Grant Assurances 20 and 21 on the merits.

In November 2022, the Administrator issued its Final Agency Decision. As a "preliminary matter," the Administrator found that Mr. Kunz had not established good cause for his failure to raise the obstacle identification studies before the Director because "Kunz and the City have been contesting this issue for several years in state courts" and Mr. Kunz himself asked the FAA to conduct both studies in 2021.

*Id.* at 559–60. The Administrator further found that Mr. Kunz did "not substantiate that he is the property owner" of the location of the proposed and existing obstacles. *Id.* The Administrator thus denied his petition to admit the studies into evidence.

The Administrator affirmed the Director's central conclusion regarding the City's obligation to acquire property interests in Mr. Kunz's land, reasoning that the FAA had not required the City to do so as evidenced by the FAA's installation of the ILS in 2008 and approval of the updated ALP in 2010. Because the updated ALP "does not state that Kunz property must be purchased for airport purposes as part of any existing or proposed project," and further because his property was not acquired with AIP funds, the Administrator agreed with the Director and the City that Grant Assurance 35 was not implicated. *Id.* at 562. The Administrator also rejected Mr. Kunz's reliance on the state court litigation, because (1) the FAA's resolution of alleged violations of grant assurances is not "dependent on the outcome of . . . state court action," and (2) Mr. Kunz's argument sounded in constitutional takings law, and "Part 16 is not the appropriate forum for alleged violations of constitutional law." *Id.* at 565.

With respect to Mr. Kunz's claim of noncompliance for the City's failure to pay litigation expenses, the Administrator reiterated that Grant Assurance 35—and the Relocation Act incorporated therein—does not apply because the "ALP provides that the Kunz parcel does not have to be purchased for airport purposes as part of any proposed project," and thus it is "outside of the FAA's jurisdiction [to] address the legal fees for the condemnation action in this case." *Id.* at 564.

16

This timely petition for review followed.

## II.    DISCUSSION

Our review of Mr. Kunz's petition is governed by the Administrative Procedure Act (the APA), 5 U.S.C. § 701 *et seq.* Under the APA, the FAA's factual determinations must be upheld if supported by "substantial evidence," 5 U.S.C. § 706(2)(E), and its legal conclusions must be affirmed so long as they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* at § 706(2)(A). *See Arapahoe Cnty. Pub. Airport Authority v. FAA*, 242 F.3d 1213, 1218 & n.5 (10th Cir. 2001).

Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fabrizius v. Dep't of Agriculture*, 129 F.4th 1226, 1237 (10th Cir. 2025) (quotation marks omitted). "The substantial evidence standard does not allow us to displace the agency's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo*." *Id.* (alterations in original and quotation marks omitted).

"Arbitrary and capricious review by this court is narrow." *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1110 (10th Cir. 2021). "We will not set aside the agency's action if it is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by statute." *Id.* (internal quotation marks omitted). "We must uphold the agency's decision as long as the agency's path may reasonably be discerned." *Id.* (internal quotation marks omitted).

Mr. Kunz petitions for review of two determinations made by the Administrator: (1) that the City did not violate Grant Assurance 35 by declining to acquire an interest in Mr. Kunz's property, and (2) that the City did not violate Grant Assurance 35 by failing to reimburse Mr. Kunz for expenses incurred in the original Utah state court condemnation proceeding. As explained below, Mr. Kunz has not shown that either determination was arbitrary and capricious or unsupported by substantial evidence.

### A.    *Whether the Administrator erred by concluding the City had no obligation to acquire an interest in Mr. Kunz's property*

At the outset, Mr. Kunz submits that the Administrator's reliance on the FAA's approval of the 2010 ALP to conclude that the City had no obligation to acquire an interest in his property was arbitrary and capricious. Specifically, he asserts that the ALP approval is of no significance to the necessity of acquisition under the grant assurances because the ALP does not prescribe "the totality of all obligations relating to the project." Pet'r's Reply Br. at 3. It is surely true that the ALP does not encompass *all* of the City's obligations under the grant assurances; for example, the ALP approval scheme could not possibly determine whether the City is complying with the grant assurances' nondiscrimination provisions. But we cannot see how that fact renders the Administrator's reliance on the ALP approval arbitrary and capricious.

Recall that Grant Assurance 29 imposes on airport sponsors an obligation to create and maintain an ALP. *See* AR at 332 (directing airport sponsors to "keep up to

18

date at all times an airport layout plan of the airport" conforming to specified requirements). But the assurance does not mandate a map for the sake of a map: the apparent conceit of Grant Assurance 29 is to permit the FAA to monitor and approve or disapprove of a sponsor's plans for the operation of an airport, in turn ensuring that an airport operates safely. First, the assurance requires the FAA to "approv[e]" an ALP and any "amendment, revision, or modification thereof" as "evidenced by the signature of a duly authorized representative of the Secretary [of Transportation] on the face ALP the airport layout plan." *Id.* The assurance then bars the sponsor from "mak[ing] or permit[ting] any changes or alterations in the airport or any of its facilities which are not in conformity with the [ALP]." *Id.* at 332–33. Finally, the assurance provides enforcement mechanisms the FAA may take against sponsors who make changes or alterations that "adversely affect[] the safety, utility, or efficiency of any federally owned, leased, or funded property on or off the airport [] which [are] not in conformity with the [ALP] as approved by the Secretary." *Id.* at 333.

Given this scheme, the FAA's approval of the ALP was appropriately regarded by the Administrator as highly relevant to whether any Airport projects required the City to acquire an interest in Mr. Kunz's property. *See* U.S. Dep't of Transp. FAA, Advisory Circular 150/55070-6B, Change 2 to Airport Master Plans, at 8 (Jan. 27, 2015), https://www.faa.gov/airports/resources/advisory_circulars/index.cfm/go/document.current/documentnumber/150_5070-6 [https://perma.cc/QZ7A-ZP7N] ("FAA approval of the ALP indicates that the existing facilities and proposed development depicted

19

on the ALP conforms to the FAA airport design standards . . . . [and] also indicates that the FAA finds the proposed development to be safe and efficient."). If the FAA, upon review of the 2010 ALP reflecting the status quo at the Airport, thought that Mr. Kunz's unencumbered property posed a risk to "the safety, utility, or efficiency" of the Airport, it was empowered to reject the ALP and require the City to acquire a property interest. *Id.* The FAA's approval of the City's ALP is thus good evidence that acquisition of Mr. Kunz's property was not required, and Mr. Kunz has not established any error in the Administrator's reliance on that approval.[9]

Having rejected Mr. Kunz's argument related to the ALP approval, we next turn to his contention that the Administrator erred by rebuffing his theories that the City was obliged to acquire an interest in his property under Grant Assurances 20, 21, and 35, and by the Utah state court litigation.[10] We address each theory below.

---

[9] FAA guidance further bolsters the conclusion that acquisition of Mr. Kunz's property was simply not required for operation of the Airport. In an advisory circular containing "standards and requirements for airport land acquisition . . . in conformance with" the Relocation Act, the FAA advises that a "sponsor must acquire real property rights of such nature and extent that are adequate for the construction, operation, and maintenance of the grant-assisted project," which generally requires a sponsor to acquire fee title to, or an easement over, "all land within the airport boundaries and for the runway protection zone." U.S. Dep't of Transp. FAA, Advisory Circular 150/5100-17, Land Acquisition and Relocation Assistance for Airport Improvement Program (AIP) Assisted Projects, at 1, 1-9 (July 10, 2017), https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC-150-5100-17-Change-7-Land-Acquisition.pdf [https://perma.cc/BVP8-HUTK]. Mr. Kunz's property is clearly outside of the Airport boundaries, and Mr. Kunz now concedes that his property "lies outside of the Runway Protection Zone[]." Pet'r's Br. at 8.

[10] Mr. Kunz separately urges that the City's operation of the Airport has resulted in a "taking" of his property for which he is owed compensation under the United States Constitution. Pet'r's Br. at 19–20. Despite Mr. Kunz's repeated

1.      **Grant Assurances 20 and 21**

Mr. Kunz first argues the Administrator erred by "limit[ing] review of the issues exclusively under Grant Assurance 35" when he "cited Grant Assurances 20, 21, and 35" in his appeal. Pet'r's Br. at 16.

When he initiated his Part 16 complaint, Mr. Kunz alleged that the City's obligation to acquire an interest in his property arose from the City's requirement to comply with the Relocation Act. *See* AR at 5–6 (citing only the Relocation Act and related regulations). After the Director rejected this contention, Mr. Kunz's appeal to the Administrator sought to situate the City's obligation as additionally arising under Grant Assurances 20 and 21. The Administrator denied Mr. Kunz's petition to admit new evidence on appeal, and thus declined to address the City's compliance with Grant Assurance 20, which requires the City to take appropriate action to remove or mitigate airspace hazards. *Id.* at 328. Mr. Kunz's petition makes no argument that the Administrator's procedural ruling was error, and so we affirm the Administrator's decision to ignore Mr. Kunz's belatedly raised argument based on Grant Assurance 20.

---

attempts to pursue a takings claim in these regulatory proceedings, the Administrator gave effect to the clear jurisdictional scope of Part 16 to decline to review such a claim. *See* AR at 565 ("Part 16 is not the appropriate forum for alleged violations of constitutional law."). Mr. Kunz does not assert that this regulatory jurisdictional determination was error, so we do not discuss his constitutional argument further, except to observe that the Administrator's determination has in no way foreclosed his ability to vindicate a takings claim in a proper forum—indeed, Mr. Kunz is actively litigating such a claim against the City in Utah state court.

But the Administrator in fact reviewed and rejected Mr. Kunz's argument that the City was obliged by Grant Assurance 21 to acquire an interest in his property. That assurance requires the City to "take appropriate action, to the extent reasonable, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft." *Id.* As the modifiers "appropriate" and "reasonable" imply, an airport sponsor can comply with Grant Assurance 21 by undertaking a range of context-specific "actions," and as the Administrator explained, "[t]he FAA does not dictate what the sponsor needs to do to promote compatible land use, such as purchasing property or air avigation easements." *Id.* at 563. This is especially true where, as here, a sponsor "does not have the authority to enact zoning ordinances" burdening the land adjacent to an airport. *Id.* FAA guidance directs that in such circumstances, a sponsor complies with Grant Assurance 21 by "demonstrat[ing] a reasonable attempt to inform surrounding municipalities on the need for land use compatibility zoning," which can be "accomplish[ed] through the dissemination of information, education, or ongoing communications with surrounding municipalities." *Id.*

In his petition, Mr. Kunz argues the City is noncompliant with Grant Assurance 21 because its efforts to promote land use compatibility zoning have been "unsuccessful." Pet'r's Br. at 17. "The repeated denial [of zoning changes] and the lack of pending ordinance changes," Mr. Kunz argues, "demonstrate the futility of the City's efforts." *Id.* at 18. But as explained, nothing in Grant Assurance 21 or its

22

interpretive guidance requires the City to be "successful" in its efforts to persuade other municipalities to enact zoning changes. And Mr. Kunz does not assert that the above standard—as set forth and applied by the Administrator—is wrong. Thus, Mr. Kunz's insistence that the absence of any zoning changes establishes the City's noncompliance with Grant Assurance 21 is nonresponsive to the Administrator's rationale. We thus affirm the Administrator's conclusion that the City is compliant with Grant Assurance 21.

## 2.    Grant Assurance 35

Next, Mr. Kunz urges that the Administrator erred by concluding that Grant Assurance 35 did not require the City to purchase an interest in his property.

Like his regulatory submissions, Mr. Kunz's petition identifies no portion of the Relocation Act or related regulations that even arguably imposes an obligation on the City to acquire an interest in his property, and our review of those laws and rules confirms that they are unconcerned with *whether* an agency decides to acquire real property. To the contrary, the Act and regulations promulgated thereunder merely set forth "policies" to "guide[]" the *means* by which an agency engages in land acquisition; as such, the provisions of the Relocation Act uniformly envision that an agency has *already* concluded that an acquisition is necessary for a federal project. *See* 42 U.S.C. § 4655 (requiring assurances from grant recipients that "*in acquiring real property* it will be guided, to the greatest extent practicable under State law, by the land acquisition policies in section 4651 of this title and the provisions of section 4652 of this title" (emphasis added)); 49 C.F.R. § 24.1 (stating that the "purpose of

23

this part [i.e., Part 24] is to promulgate rules to implement the" Relocation Act with the "objective[]" to, among other things, "ensure that owners of real property *to be acquired* for Federal and federally assisted projects are treated fairly and consistently" (emphasis added)); 49 C.F.R. § 24.2 (defining "Agency" as "any entity utilizing Federal funds or Federal financial assistance for a project or program *that acquires real property*" (emphasis added)); *see also Reg'l Transp. Dist. v. Outdoor Sys., Inc.*, 34 P.3d 408, 417 (Colo. 2001) ("The phrasing of [49 C.F.R. § 24101] implies that it covers situations where an agency identifies a parcel of land needed for a particular project and then sets out to obtain it."). FAA guidance regarding a sponsor's obligations under the Relocation Act further confirms that the Act is unconcerned with the antecedent question of *whether* real property must be acquired—that the Act is triggered only when real property acquisition is *required* for a particular project. *See* FAA Order 5100.37B, Land Acquisition and Relocation Assistance for Airport Projects, at 9 (Aug. 1, 2005), https://www.faa.gov/documentLibrary/media/Order/environmental_5100_37b.pdf [https://perma.cc/PKM4-26RR] (explaining that the Relocation Act "applies to any Federal project or program that *requires* real property acquisition" (emphasis added)); U.S. Dep't of Transp. FAA, Advisory Circular 150/5100-17, Land Acquisition and Relocation Assistance for Airport Improvement Program (AIP) Assisted Projects, at 1-6 (July 10, 2017), https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC-150-5100-17-Change-7-Land-Acquisition.pdf [https://perma.cc/BVP8-HUTK] (same).

24

In short, Mr. Kunz has not identified any portion of Grant Assurance 35, the Relocation Act to which it refers, or related regulations that compel the City to acquire an interest in his property.

### 3.      The state court litigation

Finally, Mr. Kunz asserts the City's obligation to acquire an interest in his property flows from the Utah state court's conclusion that the City had satisfied its state law obligation to show that acquisition of his property was necessary, which showing turned on the City's representation that federal grant monies were conditioned on the City's acquisition of an easement over his land.

Mr. Kunz does not suggest that the FAA was required to give preclusive effect to the state court findings in the Part 16 regulatory proceedings. Rather, Mr. Kunz faults the Administrator for failing to give "the state court's decision significant weight." Pet'r's Reply Br. at 12. But Mr. Kunz provides no authority for the proposition that the Administrator was required to give the state court litigation "significant weight," and we can find none. To the contrary, our precedent has squarely rejected any suggestion that the FAA's discretion to interpret and apply federal grant assurances can be impinged by state court litigation to which the FAA is a stranger. In *Arapahoe County Public Airport Authority*, we held that a Colorado Supreme Court decision implicating federal grant assurances had "no bearing on the FAA decision before us" because a contrary rule would "frustrate the FAA's ability to discharge its statutory duty to interpret and implement federal aviation statutes governing the enforcement of grant assurances." 242 F.3d at 1221. If the FAA were

25

required to give effect to state court decisions regarding these statutes and assurances, it would "lead to inconsistent enforcement of the federally mandated assurances, potentially jeopardizing the efficiency and equality of access to our Nation's air transportation system." *Id.*

But even if Mr. Kunz had established that the Administrator was required to give "significant weight" to state court findings, we cannot see how the Administrator erred by concluding that those findings were wrong as a matter of federal law. Specifically, the Utah state court found only that it was "undisputed"—as between Mr. Kunz and the City in litigation arising under state law—"that [an] avigation easement with the 34:1 slope was a condition of federal funding." AR at 69. This did not bar the Administrator from construing federal law to reach a contrary conclusion. Indeed, the City's representation, and the state court's acceptance thereof, was itself premised on a fundamental factual error regarding the Airport's technical specifications. As the Administrator explained, the Airport's runways require only a 20:1 landing slope, which allows for a *higher* aircraft approach than a 34:1 slope. We can see no reason why the Administrator was required, when assessing the City's compliance with its federal grant obligations, to give "significant weight" to a state court's mere recitation of an undisputed fact that was both legally and factually wrong insofar as federal law is concerned.[11]

---

[11] The same must be said of the state court's order permitting the City "to occupy [Mr. Kunz's] airspace"—that is, to permit "aircraft [to] fl[y] over [Mr. Kunz's] property"—during the pendency of the original condemnation action. AR at 86, 153. Mr. Kunz does not explain, and neither can we see, how relief granted

In sum, Mr. Kunz identifies nothing in the grant assurances or the federal laws they embody that compels the City to acquire an interest in his property. At bottom, while Mr. Kunz may well obtain just compensation in an appropriate forum under laws that are outside the Part 16 purview, the federal grant assurances simply do not create the kind of obligations he attempts to imbue them with.

### B.    Relocation Act-related request for litigation expenses

Our conclusion that Mr. Kunz can find no legal source—at least not one that is vindicable in these proceedings—for the City's obligation to acquire an interest in his property does not end the matter because Mr. Kunz maintains that the City's failure to reimburse him for litigation expenses incurred in the failed condemnation proceeding is an independent violation of Grant Assurance 35 and the Relocation Act embodied therein. *See* 49 C.F.R. § 24.107(b) (requiring that "[t]he owner of the real property shall be reimbursed for any reasonable expenses, including reasonable attorney, appraisal, and engineering fees, which the owner actually incurred because of a condemnation proceeding, if . . . [t]he condemnation proceeding is abandoned by the agency other than under an agreed-upon settlement").

The Administrator concluded that because Mr. Kunz's property "does not have to be purchased for airport purposes as part of any proposed project," the grant assurances do not compel the City to reimburse Mr. Kunz's litigation expenses. AR at 564. We can discern nothing arbitrary and capricious in that conclusion. Indeed,

---

by a state court in state law condemnation proceedings could enlarge federal obligations imposed by the grant assurances.

the Administrator's view is more consonant with the relevant provision of the Relocation Act itself, which requires reimbursement only in the context of "proceeding[s] instituted by a *Federal agency* to acquire real property by condemnation." 42 U.S.C. § 4654(a) (emphasis added). The City is not a "Federal agency" as defined by the Relocation Act. *See* 42 U.S.C. § 4601(1) (defining "Federal agency" as "any department, agency, or instrumentality in the executive branch of the government"). While the reimbursement requirements could be implicated when a federal agency *requires* a municipality to acquire real property, we cannot see how they could reach a municipality's *voluntary* efforts to do the same. *See* 42 U.S.C. § 4628 ("Whenever real property is acquired by a State agency *at the request of a Federal agency* for a Federal program or project, such acquisition shall, for the purposes of th[e] [Relocation Act], be deemed an acquisition by the Federal agency having authority over such program or project." (emphasis added)); 42 U.S.C. § 4601(3) (defining "State agency" to include "a political subdivision of a State"). But the FAA neither required nor even urged the City to acquire an interest in Mr. Kunz's property. To the contrary, the FAA installed the ILS even though the City had no enforceable interest in the property and subsequently approved an ALP that both reflected that installation and made clear that Mr. Kunz's property was entirely unencumbered.[12]

---

[12] Even if Mr. Kunz could establish error in the Administrator's rejection of his reimbursement theory, he does not explain how the City can be said to have "abandon[ed]" the condemnation proceedings, which were dismissed on Mr. Kunz's motion and over the City's objection and attempt to correct procedural deficiencies.

28

At bottom, Mr. Kunz has not shown that the Administrator's reimbursement conclusion was arbitrary and capricious, and we thus affirm the Administrator's determination that the City did not violate Grant Assurance 35 by declining to reimburse Mr. Kunz for litigation expenses incurred in the original condemnation action.

### III.    CONCLUSION

For the reasons articulated, Mr. Kunz has not established error in the FAA's resolution of his administrative complaint. We AFFIRM the FAA's Final Agency Decision.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

---

*See United States v. 4.18 Acres of Land, More or Less, in Idaho Cnty.*, 542 F.2d 786, 789 (9th Cir. 1976) (reasoning that the government could not be said to have "abandoned" a condemnation proceeding dismissed "over the government's opposition on motion by the landowner" and in the face of the government's requests "to amend the complaint to reflect the correction of the procedural error").